UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Court File No. CR-23-156 SRN/TNL

| | |
|---|---|
| United States of America,<br>    Plaintiff,<br><br>v.<br><br>Leontawan Lentez Holt,<br>    Defendant. | **Memorandum of Law in Support of Motion for Judgment of Acquittal or Alternately, New Trial** |

On April 23, 2022, Defendant Leontawan Lentez Holt exchanged gunfire with Rayshawn Brown. Mr. Brown fired one shot which nearly struck Mr. Holt. His gun then jammed, preventing him from firing any additional shots. Mr. Holt fired exactly two shots, both of which struck Mr. Brown. Mr. Brown began running away. Mr. Holt stopped firing and ran the other direction. Mr. Brown collapsed and ultimately perished.

Mr. Holt was charged by indictment with one count of using a firearm during and in relation to a crime of violence, specifically, murder in aid of racketeering. (Tr., vol. XIV at 2203.) This crime has four elements:

1) Commission of the crime of murder in aid of racketeering;

2) Knowing use of a firearm during and in relation to that crime;

3) Brandishing or discharging the firearm; and

4) Use of the firearm to cause the death of the decedent.

1

(Tr., vol. XIV at 2195, 2203). Mr. Holt pleaded not guilty and asserted self-defense. The case proceeded to trial and the jury returned a verdict finding Mr. Holt guilty.

This memorandum is submitted in support of Mr. Holt's motion for a judgment of acquittal or alternatively, a new trial. Without making any admission or concessions or waiving any future arguments, for purposes of these motions Mr. Holt is challenging the sufficiency of the evidence with respect to the first element (commission of murder in aid of racketeering) and his related claim of self-defense.

**Facts and Evidence**

Inside Williams Pub

On April 23, 2022, Mr. Holt went to Williams Pub, located in uptown Minneapolis. There was evidence from which the jury could conclude that Mr. Holt was a member of the Bloods, a street gang which operated in Minneapolis. Williams Pub was outside of the territory claimed by the Bloods. Many people were in Williams Pub that evening, some of whom have been identified. Patrons were screened for weapons prior to being admitted to Williams, including being screened using a handheld metal detector. (Tr., vol. IV at 420, 467-68.) Of those who have been identified, many are alleged to be members or associates of the Bloods, including Desean Solomon, Jaqwan Smith, Jonathan Cade, Akeem Cubie, and Antonio Jenkins, whose 30th birthday they were celebrating. (Tr., vol. X at 1649.)

One person who was present but not associated with the Bloods was Rayshawn Brown. Mr. Brown had a tattoo on his back[1] which indicated he was affiliated with the Tre Tre Crips. (Tr., vol. IV at 414.) Mr. Brown arrived at Williams accompanied by a man[2] wearing a red shirt and black vest. (Tr., vol. IV at 422-23; Gvt Ex. 401 at 11:27.) Although at one point Mr. Brown and Mr. Holt were within a few feet of one another, they did not interact while in Williams. (Tr., vol. IV at 428-29, 469; Gvt Ex. 401.)

Another person who was present but not associated with the Bloods was Jesse Walker. In fact, Mr. Walker was convicted of assault following a 2016 incident in which he stabbed Larry Wright. (Tr., vol. IV at 519-521.) The stabbing was described as "gang-related," with Mr. Walker identified as belonging to the Tre Tre Crips[3] and Mr. Wright belonging to the Bloods. (Tr., vol. IV at 521.)

---

[1] This tattoo would not have been visible while Mr. Brown was fully clothed, as he was at all relevant times on April 22, 2020. (Gvt Ex. 426 at 272; see Tr., vol. IV at 471.)

[2] In its direct examination of Sgt. Porras, the Government described the man as "unidentified." (Tr., vol. IV at 423.) On cross, Sgt. Porras agreed that he knew the man to be Mr. Brown's brother. (Tr., vol. IV at 471-72.) The man's name does not appear in the record. Johnathan Cade identified both Mr. Brown and his brother as Crips. (Tr., vol. X at 1654-55.) When asked how he knew Mr. Brown was a Crip, Mr. Cade responded: "He's from Tre Tre. He's from over north." (Tr., vol. X at 1654.) He further identified Tre Tres as "the cool Crips." (Tr., vol. X at 1655.) He was not asked about the source of his belief that Mr. Brown's brother was a Crip. This is particularly curious because the brother was wearing red, which multiple witnesses identified as being associated with the Bloods.

[3] There was evidence at trial about a general and historic rivalry between the Bloods and the Crips. However, there was also significant evidence that general rivalries were often overcome by personal relationships. The cooperating defendants generally testified to cross-gang friendships or working relationships, as well as to personal rivalries and hostilities which did not always implicate the broader gang, and to intra-gang conflicts. Johnathan Cade described Crips generally as "Oppositions. The other side. The rivals."

Mr. Walker arrived at Williams about an hour after Mr. Brown, accompanied by a man in a blue jacket. (Tr., vol. IV at 431-32; Gvt Ex. 401.) Upon entering Williams, Mr. Walker appears to greet Mr. Brown. (Tr., vol. IV at 431-32; Gvt Ex. 401.) There is no evidence that Mr. Holt was aware of this interaction. (Tr., vol. IV at 470.) After this, Mr. Walker approaches a group of young men, including Mr. Holt and Mr. Solomon. (Gvt Ex. 401.) He gestures toward a man in a grey sweater who embraces him. (Tr., vol. IV at 433; Gvt Ex. 401.) The two walk a short distance from the group and appear to converse with one another. Mr. Holt and Mr. Smith join the conversation, followed by Mr. Solomon. (Tr., vol. IV at 433-34; Gvt Ex. 401.) While there is surveillance video of the encounter, the recording did not capture the substance of the conversation. Although there are numerous patrons in the area, including at the bar and walking past the group, none display any signs of alarm. (Gvt Ex. 401.) The group talks for about a minute and a half, then Mr. Holt abruptly punches Mr. Walker. (Gvt Ex. 401.) This results in a large fight. (Tr., vol. IV at 434-35; Gvt Ex. 401.)

Mr. Brown was not in Williams when the fight started, but his brother quickly retrieved him. (Tr., vol. IV at 435-36.) Mr. Brown attempted, unsuccessfully, to get involved in the fight, possibly to break it up. (Tr., vol. IV at 436; 472.) When that did not work, he ran out of Williams and up an alley. (Tr., vol. IV at 436, 480-81; Def. Ex. 2004.)

---

(Tr., vol. X at 1647.) But he also testified that the Tre Tre Crips are a subset of the general Crips, and he described the Tre Tres as "the cool Crips" and that he did not consider them to be an opposition gang. (Tr., vol. X at 1655; vol. XI at 1784.)

Encounter on Lagoon

After leaving Williams, Mr. Holt walked to a car parked near the intersection of Hennepin and Lagoon, where he apparently retrieved two firearms. As he was walking away from that car, Mr. Brown pulled up and parked. (Tr., vol. IV at 495-96; Gvt Ex. 424.) Mr. Brown appears to be alone in his vehicle. (Gvt Ex. 424.) Mr. Holt walked right past and behind Mr. Brown but did not engage with him. (Tr., vol. IV at 496; Gvt Ex. 424.) Both men went their separate ways. Mr. Holt met up with Mr. Solomon, Mr. Smith and one other individual. (Tr., vol. IV at 449-50; Gvt Ex. 416 at 0:52.) When they met up, Mr. Holt handed a firearm to Mr. Smith. (Tr., vol. IV at 450; Gvt Ex. 416.) The group – apparently being led by Mr. Solomon – walk one way, then turn and walk the other direction.[4]

Encounter Outside Uptown Tavern

Mr. Holt encountered Mr. Brown again on the sidewalk outside Uptown Tavern Grill. Mr. Holt was with Mr. Smith, Mr. Solomon, and one other individual. Mr. Holt was walking with his hand out of his pocket and was not holding a gun. (Tr., vol. IV at 474;

---

[4] The Government describes this behavior as looking for someone and speculates that what they were looking for was a fight. However, the Government elicited testimony from Mr. Cade that the gathering at Williams was to celebrate Mr. Jenkins' birthday, and that the celebration had moved from Williams to Reign, which was a nearby nightclub. (Tr., vol. X at 1652.) There is no evidence in the record as to who was working security at Reign that evening, and whether they could be bribed to allow firearms in.

5

Gvt Ex. 416 at 23:35; Def. Ex. 2007.) Mr. Brown appeared to be alone. He strode toward Mr. Holt and his companions and as they were about to pass, pointed a firearm at them. (Tr., vol. IV at 475; Gvt Ex. 416 at 23:35:59; Def. Ex. 2014.) At the time Mr. Brown pointed his firearm at the group, Mr. Holt did not have a gun raised up. (Tr., vol. IV at 475, 484; Def. Ex. 2014.) The other individuals with Mr. Holt moved away from Mr. Brown and the direction he was pointing his firearm. (Tr., vol. IV at 475; Def. Ex. 2014; Def. Ex. 2013.) With his hand and the gun still in the pocket of his jacket, Mr. Brown fired. (Tr., vol. IV at 478.) The bullet struck a window very near to where Mr. Holt had been standing. (Tr., vol. IV at 478-79; Def. Ex. 2018.) In response to Mr. Brown, Mr. Holt pulled out a firearm and fired two shots, both of which struck Mr. Brown, who later died.

## **Argument**

The crime of murder in aid of racketeering as charged in the first element of count three has five elements, one of which is the commission of murder. (Tr., vol. XIV at 2204-5.) Without making any admission or concessions, or waiving any future arguments, for purposes of these motions only Mr. Holt is challenging the sufficiency of the evidence with respect to that element and his claim of self-defense.

The indictment charged premeditated first-degree murder in violation of Minn. Stat. § 609.185. Minnesota law permits an individual to use reasonable force to resist or aid another in resisting an offense against the person. Minn. Stat. § 609.06, subd. 1(3).

However, the intentional taking of life is only authorized in limited circumstances, including "when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death" Minn. Stat. § 609.065.[5] There are four conditions which must be met for the defense of justified taking of life to apply:

> First, the defendant's act must have been done in the belief that it was necessary to avert death or great bodily harm.
>
> Second, the judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.
>
> Third, the defendant's election to defend must have been such as a reasonable person would have made in light of the danger perceived; and
>
> Fourth, there was no reasonable possibility of retreat to avoid the danger.

(Tr., vol. XIV at 2210) (jury instructions). Because self-defense requires an individual to act in good faith, it is only available so long as the person was "not the aggressor and did not provoke the offense." (Tr., vol. XIV at 2211).

## I.     The Court should grant Mr. Holt's motion for a judgment of acquittal.

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. For such a motion,

---

[5] Without waiving his objection to the jury instructions on self-defense, Mr. Holt's position for purposes of these motions is that the evidence was insufficient even under the requirements of Minn. Stat. § 609.065.

7

the evidence is viewed in the light most favorable to the verdict." *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000). This includes deferring to the jury's assessment of the credibility of witnesses. *Id.* Acquittal is required "if no reasonable jury could have found beyond a reasonable doubt that the defendant is guilty of the offense charged." *Id.*

### A. Mr. Holt was not the aggressor

The Government has long maintained that Mr. Holt's actions inside Williams Pub make him the aggressor vis-à-vis his later encounter with Mr. Brown on the sidewalk. The problem with this argument is that the Government's evidence shows that Mr. Brown was not present when Mr. Holt struck Mr. Walker nor was he ever actually involved in the fight. According to the Government, the fight in Williams Pub was motivated by retaliation against Jesse Walker for stabbing Larry Wright.[6] To support this theory, the Government submitted evidence that Mr. Walker had been convicted of that offense and only "recently"[7] gotten out of prison. It also submitted evidence that suggested that Mr. Holt had an interest in retaliating against Mr. Walker.

What is entirely missing from the record is any evidence that Mr. Brown was in any way involved in this alleged beef Mr. Holt had with Mr. Walker. The punch and the fight inside Williams were directed specifically and solely at Mr. Walker. This despite the

---

[6] Although Mr. Holt does not accept this theory, he recognizes that his present motions require the Court to view the evidence in the light most favorable to the verdict.

[7] Just how recently is not clear in the record.

fact that many other people – including Mr. Brown and his brother – were present inside Williams in the lead up to the fight. There is no evidence that Mr. Brown was involved in the stabbing of Mr. Wright or that Mr. Holt had any other reason to retaliate against Mr. Brown. Mr. Brown was not involved in the fight. He attempted to involve himself, but when that didn't work he ran away, only to return to the area a short time later with a gun. And significantly, there is no evidence of the nature of the relationship[8] between Mr. Walker and Mr. Brown, much less that Mr. Holt was aware of the existence of any relationship at all.

The lack of aggression toward Mr. Brown is also evident in their encounter on Lagoon Avenue. Milestone camera video shows that Mr. Holt walked up to and behind Mr. Brown as Mr. Brown was parallel parking his vehicle on Lagoon Avenue. Mr. Holt apparently had two guns on his person at the time, having just retrieved them from his vehicle but not yet handed one to Mr. Smith. If Mr. Holt truly wanted to retaliate against Mr. Brown (for some as-yet unidentified reason), here was a perfect opportunity. Mr. Brown was alone and in a vulnerable position as he was sitting in the driver's seat of a vehicle, presumably with nothing but the steering wheel in his hands. He likely would have had difficulty accessing his gun and then exiting the vehicle or otherwise turning around to face Mr. Holt. Although Mr. Holt was alone, he was very close to his own

---

[8] There was evidence from which the jury could conclude that they were both Tre Tre Crips. However, there was plenty of evidence that just because individuals are members of the same gang does not always mean that they get along or have a good relationship.

vehicle, giving him a better opportunity to flee following an encounter at that location, compared to the location of the actual encounter. The only conclusions which can be drawn from his paying Mr. Brown "no nevermind" are either that he did not know Mr. Brown or he did know him, but saw no reason to shoot him. Either way, this encounter demonstrates a clear lack of aggression by Mr. Holt toward Mr. Brown.

It is also demonstrated in their encounter on the sidewalk outside the Uptown Tavern. The video clearly shows Mr. Brown striding toward Mr. Holt and his companions beginning from a distance of at least four car lengths. All the men continued in their original direction of travel until almost meeting, at which point Mr. Brown raised his arm, pointing a firearm at Mr. Holt. If Mr. Holt had been looking for a fight with Mr. Brown he would have acted much sooner. Mr. Holt and his companions outnumbered Mr. Brown both in terms of people (four to one) and firearms (at least two to one). Mr. Holt had a firearm in his pocket. There was nothing preventing him from drawing it and firing before Mr. Brown closed ranks. Mr. Holt also knew that Mr. Smith had a firearm. That it was Mr. Brown who raised his firearm first demonstrates that he was the aggressor.

Simply put, there is no evidence from which reasonable jury could have found that Mr. Holt initiated any aggression against Mr. Brown. Not inside Williams, not when they encountered one another on Lagoon Avenue, and not when they encountered one another for a third and final time on the sidewalk outside Uptown Tavern.

**B. Mr. Brown was the aggressor.**

In fact, the evidence demonstrates that it was Mr. Brown who was the aggressor. When his attempt to enter the fight failed, Mr. Brown <u>ran</u> out of Williams and down an alley. He apparently retrieved a car, which he parked near the intersection of Lagoon and Hennepin. He also retrieved a firearm. Upon seeing Mr. Holt and his companions on the sidewalk he continued striding toward them, waiting until they were within close range to raise his firearm and fire.

While Mr. Brown's actions as captured on the video is the most significant evidence of his aggression, it is not the only evidence. Although there was no evidence that Mr. Holt knew this at the time,[9] what the jury learned was that Mr. Brown was a Tre Tre Crip, as was Mr. Walker, and that the two of them knew each other. Mr. Brown saw the assault on Mr. Walker, was unable to get involved or to stop it, so he ran off and got a gun. And when he saw Mr. Holt and his companions – the same people he had just seen assault Mr. Walker, he walked right up to them, waited to get within close range,

---

[9] Mr. Brown's tattoo was covered by his clothes, and there was no testimony or other evidence of any visible sign of his alleged gang affiliation. Other than the tattoo, the only evidence connecting Mr. Brown to the Tre Tres was Mr. Cade's testimony that he recognized him as such. Mr. Cade was unable to identify the source of that knowledge, and his testimony was not clear as to whether he knew that on that night at Williams or acquired the knowledge through his trial preparations. Perhaps most significantly, his knowledge cannot be imputed to Mr. Holt because he did not get along with Mr. Holt, to the point where he deliberately chose not to shake Mr. Holt's hand that evening in Williams.

then raised a gun, pointed it, and fired. All of which strongly suggests that Mr. Brown was retaliating for the beating of Mr. Walker.[10]

### C. Mr. Holt acted in self-defense.

Mr. Brown acted and Mr. Holt reacted. Specifically, Mr. Brown pointed and fired a weapon at close range, nearly striking Mr. Holt. That Mr. Brown's first shot missed and then his gun jammed are likely the only reasons Mr. Holt is still alive today. He clearly had reasonable cause to fear imminent death or great bodily injury. Given the gravity of the threat and the proximity to Mr. Brown, his decision to defend himself – and by extension, his companions – using deadly force was reasonable. There was no immediate opportunity to flee, but as soon as Mr. Brown disengaged, Mr. Holt did exactly that – he stopped shooting and ran away from Mr. Brown, ultimately fleeing the scene entirely.

Because no reasonable jury, bearing in mind the requirement for proof beyond a reasonable doubt, could have found the evidence sufficient to disprove any of the elements of self-defense, the Court should grant Mr. Holt's motion for a judgment of acquittal.

---

[10] In fact, it seems likely that if Mr. Brown had succeeded in killing Mr. Holt he may well have been charged with premeditated murder.

## II. Alternatively, the Court should grant Mr. Holt a new trial.

A district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. The discretion to grant a new trial is broader than the discretion to grant a judgment of acquittal, though it is still to be exercised "sparingly and with caution." *United States v. Starr*, 533 F.3d 985, 999 (8th Cir. 2008) (quotation omitted). A jury verdict should be allowed to stand unless the trial court determines that the evidence weighs heavily against the verdict, such that a miscarriage of justice may have occurred. *Id.* In making this determination, the trial court is permitted to weigh the evidence and evaluate the credibility of witnesses. *Id.* A new trial may be granted "even where there is substantial evidence to sustain the verdict." *Id.*

Luis Porras worked for the Minneapolis Police Department for thirty years and spent about 17 of those years as a sergeant in the homicide unit. (Tr., vol. IV at 408-9.) In that time he worked "well over a hundred" homicide investigations. (Tr., vol. IV at 409.) He was the Government's primary witness as to the events of April 22, 2020, and his credibility was not challenged by any party. He was the primary investigator for the case, and his work included responding to the scene and reviewing all of the video. His testimony about his observations, especially in light of his training and experience, was thoughtful and measured. It is also incredibly difficult to square with the verdict.

At trial, Sgt. Porras testified at length about his investigation, including his review of the surveillance video. He was asked about action and reaction, and agreed that the

13

person who is reacting is likely to lose since the actor "has the drop" on the reactor. (Tr., vol. IV at 499.) Unless the gun jammed, anyway. (Tr., vol. IV at 499.) He also testified that, based on his review of the videos and investigation of the case, Mr. Brown was the actor. (Tr., vol. IV at 499-500.) Specifically, Mr. Brown had the gun in his jacket pocket and acted by pulling it up. (Tr., vol. IV at 500.) Mr. Holt and his companions reacted to this move by Mr. Brown. (Tr., vol. IV at 500.) Mr. Holt's reaction included discharging two rounds before "getting the heck out of there." ((Tr., vol. IV at 500.) Mr. Brown's gun jammed after his first shot. ((Tr., vol. IV at 503.) But-for that jam, Mr. Brown might well have killed Mr. Holt. ((Tr., vol. IV at 503.) Sgt. Porras's testimony about the sequence of events was clear and consistent – Mr. Brown made the first move, turning toward Mr. Holt and firing at him. (Tr., vol. IV at 512.) Split seconds later Mr. Holt raised his gun and fired back. (Tr., vol. IV at 512.)

It is difficult to reconcile Sgt. Porras's testimony and the videos with the jury's verdict in this case. It is true that it is impossible to tell from the video at what exact moment Mr. Holt pulled a gun out of his pocket. He clearly did not have it in his hand 1:31 into Exhibit 416, but did have it in his hand at 1:42. (Tr., vol. IV at 508-9.) There is not a clear view of his hand or pocket in the intervening eleven seconds. (Tr., vol. IV at 509.) Sgt. Porras testified that his shoulder did appear to go up at about 1:38 into the video, which <u>could be</u> consistent with him removing something from his pocket. (Tr., vol. IV at 510.) The Government's speculation that Mr. Holt could have pulled a gun out

before Mr. Brown pointed his is exactly that – speculation. What is clear – both from the video and from Sgt. Porras's testimony – is that Mr. Brown pointed a gun at Mr. Holt before Mr. Holt pointed a gun at him. The discrepancy between Sgt. Porras's testimony and the recording on the one hand and the verdict on the other should give the Court significant doubts that a miscarriage of justice may have occurred.

## Conclusion

The evidence in this case was not sufficient to disprove Mr. Holt's claim of self-defense. Consequently, the Court should grant his motion and enter a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c)(1). But even if the evidence were minimally sufficient, the verdict is so contrary to the overwhelming weight of the evidence that the Court should grant his motion for a new trial pursuant to Fed. R. Crim. P. 33(b) to prevent a manifest injustice.

Respectfully submitted,

Dated: November 22, 2024

/s/ Karen Mohrlant
F. Clayton Tyler (11151X), fctyler@fctyler.com
Karen Mohrlant (388093), kmohrlant@fctyler.com
F. Clayton Tyler, P.A.
331 Second Avenue South, Suite 230
Minneapolis, MN 55401
Ph: 612-333-7309
Fax: 612-333-5919
Attorneys for Mr. Holt